## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

**DISTRICT OF COLUMBIA,**
a municipal corporation,
400 6th Street, N.W.
Washington, D.C. 20001,

       Plaintiff,

    v.

**PRO-FOOTBALL INC d/b/a**
**WASHINGTON COMMANDERS,**

Serve On:
CSC-Lawyers Incorporating Service
Company,
7 St. Paul Street, Suite 820
Baltimore, M.D. 21202,

**DANIEL SNYDER,**

Serve On:
7979 E Boulevard Drive
Alexandria, V.A. 22308,

**THE NATIONAL FOOTBALL LEAGUE,**

Serve On:
The National Football League
345 Park Avenue
New York, N.Y. 10154

and

**ROGER GOODELL**,

Serve On:
280 Park Ave, Fl 12W
New York, N.Y. 10017

       Defendants.

Case No.:  2022-CAB-005171

**COMPLAINT**

**JURY DEMAND**

**TABLE OF CONTENTS**

**INTRODUCTION** ............................................................................................................. **3**

**JURISDICTION** ............................................................................................................... **6**

**PARTIES** .......................................................................................................................... **6**

**FACTS** ............................................................................................................................... **8**

   I.   THE COMMANDERS TARGET DISTRICT CONSUMERS AS ITS CORE
       CONSUMER BASE ............................................................................................... 8

      A.   The Team Closely Identifies with the District ............................................. 8

      B.   The Team Extensively Markets to District Consumers. ............................... 9

   II.  TO PRESERVE FAN SUPPORT, SNYDER AND THE TEAM FALSELY
       DENIED KNOWLEDGE OF A TOXIC WORKPLACE RIFE WITH
       SEXUAL HARASSMENT. ..................................................................................... 11

      A.   Snyder Fostered a Culture That Glorified Sexual Harassment and Discouraged
          Reporting. ................................................................................................... 11

      B.   The Team's Toxic Culture Was Epitomized by Its Cheerleading Program. ............. 15

      C.   Snyder Denied Personal and Team Management's Knowledge of Extensive Sexual
          Misconduct at the Team, Despite His Direction and Participation in Much of the
          Wrongdoing and Specific Complaints Raised to Leadership. ..................................... 16

  III.  DEFENDANTS LAUNCHED AN INVESTIGATION AND PROMISED THEIR
       FULL COOPERATION SO FANS COULD TRUST THE RESULT, WHILE
       PRIVATELY WORKING TO THWART THAT GOAL. ....................................... 17

      A.   The Team And League Responded To Consumer Concern By Launching An
          Investigation. ............................................................................................... 18

      B.   Defendants Worked Behind The Scenes To Undermine the Promise of an Unbiased
          and Thorough Investigation. ........................................................................ 22

          1.   The NFL and the Team Entered into a Secret Agreement. ................................. 22

          2.   The NFL Allowed Snyder to Attempt to Interfere in the Investigation. .............. 23

          3.   The League and Team Worked Together to Block the Public's Knowledge of
             Wilkinson's Findings. ............................................................................... 28

          4.   Defendants' Actions Contradict Their Public Statements and Undermine
             Consumers' Confidence in the Investigation's Outcome. ...................................... 31

  IV.  DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS ARE MATERIAL TO
       DISTRICT CONSUMERS, WHO CARE DEEPLY ABOUT THE TEAM. ................... 32

**CAUSES OF ACTION** ................................................................................................. **35**

**PRAYER FOR RELIEF** ............................................................................................... **37**

**JURY DEMAND** ........................................................................................................... **38**

**APPENDIX** ...................................................................................................................... **39**

Plaintiff the District of Columbia (the District) brings this action against Pro-Football, Inc. d/b/a the Washington Commanders (the Team), Team owner Daniel Snyder, the National Football League (the NFL or the League), and NFL Commissioner Roger Goodell (collectively, Defendants) for public misrepresentations, omissions, and ambiguities of material fact, all of which violate the District of Columbia Consumer Protection Procedures Act (CPPA), D.C. Code §§ 28-3901, *et seq.* In support of its claims, the District states as follows:

## INTRODUCTION

1.      In order to sell expensive tickets and merchandise and maintain the Team as a profitable part of the League, Defendants need the Team to inspire public confidence and fan loyalty. But Defendants repeatedly attempted to bolster such confidence and loyalty through artful deception to the detriment of District consumers.

2.      Faced with public outrage over detailed and widespread allegations of sexual misconduct and a persistently hostile work environment at the Team, Defendants made a series of public statements to convince District consumers that this dysfunctional and misogynistic conduct was limited and that they were fully cooperating with an independent investigation. These statements were false and calculated to mislead consumers so they would continue to support the Team financially without thinking that they were supporting such misconduct.

3.      In summer of 2020, public reporting on decades of sexual harassment, verbal abuse, and pervasive toxicity at the Team threatened the Team's image and generated consumer outrage. The reports revealed a severely broken culture—created and encouraged by long-time owner Dan Snyder—in which women were openly objectified, and fear and intimidation reigned. The Team knew its fans would not continue to financially support businesses that knowingly tolerated this

misconduct. Snyder thus denied that he or Team management had any knowledge of the misconduct to reassure consumers, but these denials were false.

4.    To continue rebuilding public confidence, the Team and the NFL quickly sought to allay consumers' concerns by launching an independent investigation and promising full cooperation so the results would be unbiased.

5.    The Team hired a well-known attorney, Beth Wilkinson, to conduct an "independent third-party investigation into allegations about [the Team's] culture and incidents of harassment." Snyder stated publicly that Wilkinson was "empowered to do a full, unbiased investigation and make any and all requisite recommendations."

6.    As allegations continued to surface against Snyder and the Team, the NFL (via Commissioner Goodell) initially supported the Team's continued oversight of the Wilkinson Investigation and vowed to "ensure that the club and its employees satisfy their obligation to *give full cooperation* to investigators" (emphasis added). But fans were vocal, and they did not trust the Team to oversee an investigation into itself. The NFL then assumed control of the investigation and Snyder promised this move was "so that the results are thorough, complete and trusted by the fans, the players, our employees and the public."

7.    Those statements outwardly projected a commitment by Defendants to conduct an unbiased investigation into the misconduct at the Team that would have the full cooperation of leadership, would restore public trust, and would reassure District consumers that their home team was a safe environment that they could continue to support.

8.    Despite their public proclamations promising to uphold the integrity of the investigation, Defendants actively worked to thwart the investigation and suppress its results. Days after assuming control of the investigation to ensure it was independent of the Team, the League

entered into an agreement with the Team that guaranteed Snyder the authority to block the public release of any information coming out of the investigation.

9.      Meanwhile, Snyder and the Team launched a campaign to interfere with and obstruct the investigation. Snyder and the Team attempted to prevent witnesses from talking to Wilkinson through payoffs and intimidation and engaged in aggressive, abusive litigation to dig up information on victims and the journalists who reported on Defendants' misconduct. The NFL was fully aware of this intimidation campaign. The course of Defendants' conduct suggests the NFL was never serious about overseeing a thorough and complete investigation into Snyder and the Team's misconduct. As the investigation progressed, the NFL received routine updates from Wilkinson's investigators. Weeks after Goodell was first personally briefed by Wilkinson, during the heart of the investigation into Snyder's pervasive misconduct, the NFL approved a waiver of League rules to let Snyder buy out three minority owners and gain 100% ownership control of the Team. Finally, the NFL refused to release Wilkinson's detailed findings after a lengthy investigation (an arrangement negotiated directly with Snyder).

10.     District consumers reasonably understood from all the Defendants' public statements that a full, independent investigation would help restore their confidence in the Team. Instead, consumers got false promises and a cover-up that allowed the Team's malfeasance to remain in the shadows.

11.     This consumer protection action seeks accountability from the Washington Commanders, Snyder, the NFL, and Commissioner Goodell for public statements, ambiguities, and omissions that tended to mislead District consumers in the form of injunctive relief, civil penalties, and restitution.

## JURISDICTION

12.     This Court has subject matter jurisdiction over the claims and allegations in the Complaint. *See* D.C. Code § 11-921(a).

13.     This Court has personal jurisdiction over Defendants pursuant to D.C. Code § 13-423.

## PARTIES

14.     Plaintiff District of Columbia, a municipal corporation, is the local government for the territory constituting the permanent seat of the government of the United States. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General conducts the District's legal business and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1). The Attorney General is expressly authorized to enforce the District's consumer protection laws, including the Consumer Protection Procedures Act. *See* D.C. Code § 28-3909.

15.     Pro-Football, Inc. is the corporate entity that owns the Washington Football Team. As of 2020, the Team is known as and does business as the Washington Commanders. Pro-Football, Inc. is incorporated in Maryland and has its principal office in Baltimore. The Washington Football Team is one of 32 separately owned and independently operated professional football teams that make up the National Football League. In the regular course of business, the Team sells tickets, merchandise, and other consumer products to District residents.

16.     Daniel Snyder is an individual who resides in Virginia and is the majority owner of the Washington Commanders. Snyder purchased and became majority owner of the Team in 1999. In 2021, with the benefit of a debt-waiver approved by the NFL, he purchased the shares of multiple minority owners, consolidating 100% of the Team's ownership in himself, his mother,

and his sister. Snyder was the sole chief executive officer (CEO) of the Team from his initial purchase until June 2021, at which time his wife, Tanya Snyder, became co-CEO. At all times material to this Complaint, acting alone or in concert with others, Snyder formulated, directed, controlled, had the authority to control, participated in, or with knowledge approved of the acts or practices of the Washington Commanders, including the acts and practices set forth in this Complaint.

17.     Defendant National Football League (NFL or the League) is an unincorporated trade association that consists of 32 separately owned and independently operated professional football teams. The NFL, directly and through subsidiaries, is engaged in interstate commerce in the business of, among other things, promoting, operating, organizing, and regulating the major professional football league in the United States, including in the District of Columbia. The National Football League directs its business to the District by advertising in the District, selling tickets to District residents, and otherwise cultivates and exploits its business in the District by specifically targeting District consumers for commercial gain.

18.     Defendant Roger Goodell has been the Commissioner of the National Football League since 2006. At all times material to this Complaint, acting alone or in concert with others, Goodell formulated, directed, controlled, had the authority to control, participated in, or with knowledge approved of the acts or practices of the National Football League, including the acts and practices set forth in this Complaint.

**FACTS**

I.   **THE COMMANDERS TARGET DISTRICT CONSUMERS AS ITS CORE CONSUMER BASE.**

A.  **The Team Closely Identifies with the District.**

19.     The NFL and the Commanders (then called the Washington Redskins) won the hearts of District sports fans through decades of success that included three Super Bowl victories in 1983, 1988, and 1992. The Team has been a mainstay of District life for more than eighty years.

20.     The Team's connection to the District began in 1937, when George Preston Marshall, then-owner of the NFL Boston Redskins, moved the team to the District, and renamed the team the Washington Redskins. From 1937 to 1961, the Team played at Griffith Stadium, a 20,000-seat stadium located in the Shaw neighborhood of the District.

21.     In 1961, the Team entered into a 30-year lease to play its games at the Robert F. Kennedy Memorial Stadium (RFK), a 50,000-seat stadium in Northeast Washington, D.C.

22.     The Team continued to play at RFK until its lease expired in 1996, at which time the Team began playing its home games in a new stadium in Landover, Maryland.

23.      Snyder purchased a majority stake in the Team and its Maryland stadium in 1999 for $800 million. Later that year, Snyder sold the naming rights for the stadium and renamed it FedEx Field, which remains the Commanders' home stadium.

24.     In 2021, Snyder bought out the three primary minority owners of the Team, consolidating 100% of the Team's ownership in his family.

25.     With a nearly 100% personal ownership interest in the Team, Snyder has significant incentives to increase consumer interest and confidence in the Team to maintain the financial success of the Team and his significant wealth.

**B.  The Team Extensively Markets to District Consumers.**

26.     Despite now playing in Maryland, the Team continues to treat the District as its home. The *Washington* Commanders and the NFL have specifically targeted District consumers for decades, and they continue to direct their branding, marketing, and sales efforts to attract the business of District consumers.

27.     For decades, the Commanders have broadcast games over television and radio stations that dominate District airwaves.

28.     The Team has also specifically courted District consumers by targeting philanthropy in the District, such as providing grants to District schools, providing scholarships to students at universities in the District, and otherwise supporting D.C. charities, low-income District residents, District sports teams and coaches, and District schools.

29.     The NFL's bylaws divide and assign markets to each of its franchise teams. Since its creation, the Washington Football Team has maintained a "home city" of Washington, D.C. and controlled the entire District market.

30.     This long-standing connection was further highlighted by the Team's name change to the Commanders, as the Team emphasized that it chose the name because it "represents the nation's capital."

31.     In the Team's rebranding, the Commanders have also emphasized its connection with the District through the lettering on its logo, displaying the District flag on its uniform, and using the prominent letter W for Washington on their helmets.



32.     The Team noted that the inclusion of the D.C. flag "stands as a symbol that honors and celebrates the DC community."

33.     The Team recently unveiled new official jackets that include a large "D.C." insignia on one side of the chest and abbreviations for all four quadrants of the District on the other.



34.     The Commanders continue to target District consumers in its marketing and sales efforts, such as promoting the purchase of team apparel, ticket sales, and the rental of executive suites, including by sending direct mailers to District residents.

## II.     TO PRESERVE FAN SUPPORT, SNYDER AND THE TEAM FALSELY DENIED KNOWLEDGE OF A TOXIC WORKPLACE RIFE WITH SEXUAL HARASSMENT.

35.     In 2020, reporting of a hostile workplace cratered consumer confidence in the Team and its ownership, leading many District fans to consider withdrawing financial support—thus threatening Defendants' profits. Snyder falsely represented to consumers that he and the Team's leadership lacked knowledge of the allegations contained in the report in an effort to maintain fan support.

### A.  Snyder Fostered a Culture That Glorified Sexual Harassment and Discouraged Reporting.

36.     For decades, Snyder has cultivated an environment within the Team that glorifies sexual harassment and punishes victims for speaking out.

37.     Employees say the workplace was "like the mafia," in which Snyder and prominent executives regularly used bullying and vulgar language when talking to subordinates, creating a culture of fear and paranoia.

38.     Cheerleaders and female employees were exploited and harassed. Some male employees were bullied into participating in this hyper-masculine culture for fear of losing their jobs. There was no functional human resources department or reliable mechanism for employees to report harassment and bullying.

39.     The toxic culture, created and condoned by Snyder, permeated every corner of the Team, leaving no safe avenue to get help. The misconduct did not just go to the top; it originated there.

40.     A former executive who worked at the team for 24 years stated that employees referred to Snyder as the "Chief Harassing Officer."

41.     As one example of Snyder's direct harassment of employees, Snyder bullied male employees and questioned their sexual orientation when they did not conform to Snyder's perception of manhood.

42.     Snyder himself has been accused of sexually harassing female employees. One former female employee claimed that Snyder sexually harassed and assaulted her in April 2009, and her case was subsequently settled just a couple of months later.

43.     Another former Team cheerleader alleges that Snyder propositioned her to have sex with his friend at a 2004 party. At the time of the incident, the cheerleader reported Snyder's misconduct to the Team's cheerleader director and to the marketing director for the cheerleading squad. In turn, she was merely advised to avoid Snyder for the rest of the night. Because Snyder owned the Team, she did not feel there was anything more she could do about his comment, and she did not publicly report it until 2020.

44.     In further cultivating the Team's culture of sexual harassment, Snyder often brought women believed to be sex workers to work-related events, which in turn made Team employees feel uncomfortable.

45.     One such event occurred at Snyder's vacation home in Aspen, Colorado, in 2005 or 2006. After entertaining several employees at a nightclub, Snyder brought them back to his vacation home, and the female employees were escorted to the basement for the rest of the night

while the male employees remained upstairs. At one point, Snyder came downstairs wearing only a bathrobe and offered the women champagne. That same night, one female employee went upstairs and saw a nude woman giving a massage to a male Team executive and saw another woman wearing only a bathrobe exiting Snyder's bedroom. The female employees did not know these women and believed they were sex workers. Because they had traveled on Snyder's plane out of state, despite their discomfort with the executives' behavior, these female employees felt trapped.

46.     In another incident in which a Team executive traveled with Snyder on his private plane, Snyder informed the executive that he had girls "lined up," including one for the executive. When they arrived at the hotel, there were a number of women in the suite whom the executive had never met. Given that Snyder had flown the women in from another state, and that these women were physically affectionate with Snyder and the male employees Snyder had brought with him, the executive believed that the women were sex workers, which made him feel deeply uncomfortable. Again, having traveled privately with Snyder, he felt captive.

47.     Snyder's personal involvement in harassing employees created a culture in which the Team's other powerful men were permitted to do the same. As a result, executives and other employees routinely sexually harassed and objectified female employees and the Team's cheerleaders, and they faced no recourse from Snyder when he was made aware of their misconduct.

48.     At least one such report of sexual harassment was emailed to Snyder and other executives directly by a female chef. She detailed an incident in which the Team's head chef, after noticing the female chef had changed clothes by her locker, said in front of other staff, "I wish I knew, I would have followed you back there. Do you know the last time I had sex?" She

specifically noted she was scared to report the incident because the head chef bragged he was untouchable because Snyder had hired him.

49.     In another example, Larry Michael, the Team's long-time broadcaster and senior media executive, was accused of sexual misconduct by multiple people. Specifically, in 2018, the Team's President of Business Operations told Snyder that Michael sexually harassed a marketing and customer service employee by touching and kissing her and making unwanted comments about her appearance.

50.     Also in 2018, Michael was caught on a hot microphone during a broadcast of a game making inappropriate sexual remarks about an intern.

     a.  Michael said, "I do think our intern is looking better every day. I do think our intern is . . . little blonde there talking to Aces . . . she's looking pretty good there."

     b.  Second individual: "That's a hell of an outfit."

     c.  Michael: "I don't know what the fuck's going on there."

51.     In response, Snyder dismissed the allegations and said Michael "was a sweetheart" and "wouldn't hurt anybody." Michael remained at the Team until 2020, when the *Washington Post* publicized his misconduct.

52.     In another episode, Snyder was informed of sexual misconduct between a player and two cheerleaders. In response, Snyder placed the blame on the victims, directing the firing of the cheerleaders to "minimize distractions, temptations for players." There were no consequences for the player.

53.     Likewise, when Snyder was told that a member of the coaching staff groped an employee, Snyder refused to do anything about it. Instead, he directed that the victim should "stay away from the coach."

**B. The Team's Toxic Culture Was Epitomized by Its Cheerleading Program.**

54.     After purchasing the Team, Snyder brought the cheerleading program in-house, under his supervision. Snyder exercised control over everything, from which cheerleading candidates made the cut, to which photos were used in the cheerleader calendar, to how revealing the cheerleading uniforms would be. He regularly told people to keep the cheerleaders "skinny with big tits."

55.     Snyder also revised the annual cheerleader calendar to be a swimsuit calendar. He required more photos of cheerleaders covering their bare chests with their arms and hands, photos of cheerleaders covered in only body paint, and photos of cheerleaders in lingerie.

56.     At Snyder's insistence, and over prior objections of some other executives, sponsors were invited to far-flung locations to observe these calendar photo shoots up close. This resulted in cheerleaders being ogled by unknown men and made to feel uncomfortable as a result. One cheerleader told the *New York Times* in 2018, at one of the shoots "we were basically standing around [another cheerleader] like a human barricade because she was basically naked, so we could keep the guys from seeing her . . . . I was getting so angry that the guys on the trip were skeezing around in the background."

57.     According to a leader of the cheerleading team, Team executives would sneak photographs of cheerleaders in compromising situations during the shoot and send the pictures to Snyder.

58.     When the calendar shoots were filmed, cameras were often kept continuously recording, despite cheerleaders' requests that certain portions not be filmed. Those videos often captured nudity, because the cheerleaders posed topless or nude, and the recordings captured the body painting process.

59.     This footage was often taken without the cheerleaders' awareness or consent.

60.     Afterwards, Snyder directed Team executives to have employees and contractors edit videos together using footage of the cheerleaders from the calendar shoots—including the footage the cheerleaders had specifically requested not be shot. Snyder mandated that these videos include the "good bits," which producers understood to mean unedited images of cheerleaders' exposed breasts and pubic areas.

61.     These voyeuristic videos were reportedly scored with Snyder's favorite songs and given directly to Snyder.

### C. Snyder Denied Personal and Team Management's Knowledge of Extensive Sexual Misconduct at the Team, Despite His Direction and Participation in Much of the Wrongdoing and Specific Complaints Raised to Leadership.

62.     In a series of articles between July 16, 2020, and October 16, 2020, the *Washington Post* provided detailed reporting on allegations from more than a dozen women, including former cheerleaders and employees, of extensive and prolonged sexual harassment and verbal abuse while at the Team. The reporting also focused on the surreptitious footage taken from the cheerleader swimsuit calendar shoots, including the cheerleaders' reactions to learning how they had been exploited. Together, the three reports publicized the Team's misogynistic, dangerous workplace and Snyder's role in creating and promoting it.

63.     Upon reading these reports, District consumers were particularly horrified by Snyder's role in the alleged misconduct. Fans spoke out on public message boards, demonstrating their outrage at the allegations and Snyder's role specifically.

64.     Fans became concerned that by financially supporting the Team they were funding a toxic workplace and an owner that rewarded the mistreatment of its female staff.

65.     Snyder addressed the allegations against him by flatly—and falsely—denying he knew anything about the toxic workplace culture—a culture that, in fact, he had created and encouraged.

66.     Although Snyder had been informed numerous times over the years that Team staff and executives were engaging in sexual misconduct, Snyder claimed he was "unaware of these allegations until they surfaced in the media" and that his ignorance was because he had "admittedly been too hands-off as an owner and allowed others to have day-to-day control to the detriment" of the Team.

67.     He additionally denied specific parts of the reporting that personally implicated him. For example, in response to the allegation that Snyder propositioned a cheerleader to have sex with his friend, Snyder claimed she "never [brought] any of these allegations to management's attention" and she "did not report this alleged incident to anyone at the team in 2004." As described above, this is false, as she reported it to two different people at the time, including management.

68.     As to the lewd, non-consensual cheerleader videos he was alleged to have requested, Snyder claimed to "not have any knowledge of the ten-year old videos referenced in the story. I did not request their creation and I never saw them."

69.     These statements directly contradicted the extensive evidence detailed above of sexual harassment and a toxic workplace cultivated by Snyder himself.

III.    **DEFENDANTS LAUNCHED AN INVESTIGATION AND PROMISED THEIR FULL COOPERATION SO FANS COULD TRUST THE RESULT, WHILE PRIVATELY WORKING TO THWART THAT GOAL.**

70.     Defendants knew that allegations of sexual misconduct and a hostile workplace would alienate fans and threaten their profits, so the Team, the NFL, and their executives publicly launched an investigation into the allegations. The Team engaged a respected D.C. attorney—Beth

Wilkinson—to conduct an independent investigation, and later the NFL took over the investigation to give consumers confidence that it would be free from interference by Snyder and the Team.

71.     With the investigation under the NFL's control, Defendants' statements[1] gave District consumers the overwhelming impression that Snyder and the Team would fully cooperate with the investigation and that the public could trust the investigation's results because they would ensure it would be thorough and unbiased.

72.     But behind the scenes, Defendants engaged in a course of conduct that was directly contrary to their public statements. Among other things, the NFL entered into an agreement that functionally gave Snyder veto power over what parts of the investigation would be made public, allowed Snyder and the Team to wage a campaign to block Wilkinson from accessing witnesses and documents, and gave the public no full accounting of the investigation's results. Taken together, Defendants' actions reflect conduct contrary to what they had communicated to the public, undermining confidence in the results—confidence that Defendants assured would be restored by the investigation.

**A.   The Team And League Responded To Consumer Concern By Launching An Investigation.**

73.     On July 17, 2020, the day after the first of the three *Washington Post* articles, Snyder announced he and the Team had hired Beth Wilkinson of Wilkinson Walsh LLP[2] to conduct an internal investigation of the allegations (the Wilkinson Investigation). Snyder stated, "Beth Wilkinson and her firm are empowered to do a *full*, unbiased investigation and make any and all requisite recommendations" (emphasis added).

---

[1] A chronology of many of Defendants' misleading statements is included in the attached Appendix and incorporated herein by reference.
[2] Wilkinson Walsh LLP became Wilkinson Stekloff in November 2020.

74.    The NFL initially echoed Snyder's commitment and supported the Team's effort to investigate the allegations on its own: "Washington has engaged outside counsel to conduct a thorough investigation into these allegations. The club has pledged that it will give its *full cooperation* to the investigator and we expect the club and all employees to do so. We will meet with the attorneys upon the conclusion of their investigation and take any action based on the findings" (emphasis added).

75.    Weeks later, Defendants again tried to assure the public that they were taking the allegations seriously after the *Post* reported the additional allegations about the cheerleader videos and Snyder's own sexual misconduct.

76.    In response to the *Post* reporting, the Team declared it was "committed to investigating [the allegations] fully."

77.    The NFL and Goodell also doubled down, again supporting the Team's oversight of the investigation and promising they would "ensure that the club and its employees satisfy their obligation to give *full cooperation* to the investigators" (emphasis added).

78.    Despite Defendants' efforts to quell fans' concerns, some fans recognized that Snyder and the Team could not be trusted to investigate themselves, and any investigation in which Snyder retained control would not lead to actual accountability.



**Ben**
@_BenBecker

···

This is incredibly important. People who care need to pressure the NFL not to take DAN SNYDER'S hired attorney's word for it (no matter how accomplished she may be). NFL needs to conduct its own investigation or nothing will change.

>  **ProFootballTalk** ✔ @ProFootballTalk · Jul 17, 2020
> The NFL typically hires the lawyer who investigates allegations of team misconduct; for some reason, the NFL plans to defer to the lawyer hired by Washington to investigate Washington wp.me/pbBqYq-bA1m

9:06 AM · Jul 17, 2020 · Twitter Web App

---



**Naveed Khan**
@naveed_a_khan19

···

Replying to @washingtonpost

NFL should investigate. Washington NFL Team's own investigation will not be Credible. @NFL #NFL

11:58 AM · Jul 17, 2020 · Twitter Web App

---



**BJL1906**
@Big_John_1906

···

Replying to @john_keim

Very weak statement by the NFL. You can't have and "independent investigation" by someone you hire. The league should have also launched an investigation if they were serious. They spent millions on air pressure in footballs but are cool sitting this one out. SMMFH

7:22 AM · Jul 17, 2020 · Twitter for Android

79.     And so, on August 31, 2020, in response to consumers' concerns, the NFL stepped in to take over the investigation; Wilkinson would now report to Goodell and the League, rather than Snyder and the Team.

80.     Snyder publicly endorsed the move, saying "Tanya [Snyder, his wife] and I suggested that the NFL assume full oversight of the investigation so that the results are thorough, complete and trusted by the fans, the players, our employees and the public." Snyder's statement asserted that the Team "remains *committed to fully cooperating* with all aspects of the investigation" (emphasis added).

81.     At the time, it was even reported (and later also asserted by Team representatives) that Snyder and the Team were releasing former employees and cheerleaders from nondisclosure agreements for the express purpose of speaking with the Wilkinson firm.

82.     Defendants chose to publicly transfer control over Wilkinson's investigation to the NFL to bolster consumer confidence in their response to the *Post*'s reporting and the outcome of the investigation.

83.     Lisa Friel, the NFL's internal head of investigations, said to the press: "Our message to everyone has been consistent — we want to ensure that Beth Wilkinson can complete her work thoroughly and *without interference*" (emphasis added).

84.     District consumers understood the NFL's takeover of the Wilkinson Investigation to mean that the League would ensure the Investigation was free from Snyder's interference.

85.     Fans responded favorably and believed the transfer of power would lead to a thorough investigation. For example:

21



86.     As demonstrated below, however, Defendants' statements were false, omitted material information, and had a tendency to mislead District consumers.

**B. Defendants Worked Behind The Scenes To Undermine the Promise of an Unbiased and Thorough Investigation.**

87.     The totality of Defendants' actions—out of public view—demonstrate they were acting in concert to hinder Wilkinson's investigative efforts, to permit interference with that investigation, and otherwise undermine their public statements that they would preserve the Investigation's integrity.

1. The NFL and the Team Entered into a Secret Agreement.

88.     Days after publicly declaring that the NFL had taken control of the investigation away from the Team to ensure it was unbiased and fully independent, the NFL and the Team entered into a Common Interest Agreement (Agreement) that established their joint legal interest in upholding "the integrity of the Investigation and the defense of reasonably anticipated litigation." It allowed the sharing of confidential information and communications and other privileged information both among themselves and with Wilkinson's firm.

89.     In addition, the Agreement granted the Team and Snyder *the ability to block the release of any "information or communications" that resulted from it*, including what the public would ultimately learn about Wilkinson's findings.

90.     Entering into this Agreement directly contradicted the Team's and the NFL's public representations that the investigation would be free from interference and could be trusted by the fans. Through this Agreement, the NFL ultimately gave Snyder the power to veto the release of Wilkinson's investigation findings, thereby exercising continued control over the public's understanding of the Team's hostile workplace—all without the public's knowledge.

91.     Moreover, the NFL entered this agreement with full knowledge of the allegations of pervasive sexual harassment and misconduct that had been attached to Snyder and the Team for years.

92.     Defendants failed to disclose to consumers that they entered into this Agreement immediately after publicly reassuring consumers the NFL had assumed oversight of the Wilkinson Investigation, instead continuing their façade that the NFL had taken full control.

> 2.     The NFL Allowed Snyder to Attempt to Interfere in the Investigation.

93.     After the NFL took over the investigation, Snyder and the Team (acting at Snyder's direction) quickly launched an effort to discourage witnesses from participating and to influence Wilkinson's conclusions.

94.     With the NFL's blessing, Snyder and the Team attempted to hinder the investigation by preventing witnesses from speaking with Wilkinson. More specifically, Snyder and the Team sent private investigators to witness's homes and intimidated them, engaged in abusive litigation to prevent witness participation, and offered additional money to former employees who had previously settled claims against Snyder.

95.     The NFL was aware of Snyder's attempted interference with the investigation but allowed it to continue and downplayed its significance. Commissioner Goodell characterized Snyder's abusive litigation and use of private investigators as "a little bit of tug and pull with particularly [*sic*] lawyers and law firms," while publicly guaranteeing it did not interfere with Wilkinson's work.

*a. Snyder used private investigators to intimidate witnesses.*

96.     Snyder actively interfered with the investigation by sending private investigators (PIs) on unannounced visits to witnesses' homes.

97.     Witnesses reported the PIs scared and discouraged them from participating in the Wilkinson Investigation or otherwise speaking publicly against Snyder, and they were afraid Snyder might find other ways to harm or intimidate them.

98.     One PI waited outside a witness's home for hours, showing up on multiple days, and also harassed her neighbors. When the witness ultimately spoke with the PI, he told her the Team sent him to speak with her. That witness subsequently reported being scared for her own safety and that of her children.

99.     Another witness said that she felt certain the PIs were sent by Snyder because they asked pointed questions about a former executive who Snyder had tried to blame for the misconduct.

100.    One of the named sources in the *Post*'s reporting about the nonconsensual cheerleader videos was alarmed to learn that Snyder and the Team sent PIs to the homes of his ex-wife and several of his former co-workers.

101.    The NFL knew of Snyder's use of PIs to try to obstruct the Investigation. On August 4, 2020, a witness informed the NFL's general counsel both that a PI employed by Snyder had

come to his home and that a former Team employee told him she was approached and "cornered" by a PI as well.

102.     Lawyers for former employees who had accused Snyder and others at the Team of sexual misconduct also told the NFL—on the same day it assumed control of the Wilkinson Investigation—that Snyder had been intimidating witnesses by sending PIs to their homes.

103.     Even armed with the knowledge of Snyder's efforts to intimidate witnesses and attempt to obstruct the Wilkinson Investigation, the NFL did nothing to stop them. To the contrary, the NFL allowed Snyder to maintain complete control over the investigation for weeks and then entered into the Agreement with the Team for continued access, including access to information that would allow him to target additional witnesses.

>  *b.  Snyder utilized abusive litigation to gather information and attempt to obstruct the investigation.*

104.     Contrary to their public commitment to ensure full cooperation with the investigation, the Team and Snyder also interfered with the Wilkinson Investigation by engaging in abusive litigation to gather information about potential witnesses.

105.     Shortly after the *Washington Post* exposés were published, Snyder filed a defamation case in New Delhi, India, related to an obscure online article that accused Snyder of sexual misconduct and connections to the infamous Jeffrey Epstein.

106.     While appearing unrelated, Snyder used this litigation as an additional means to attempt to obtain documents related to the *Washington Post* reporting through discovery proceedings in seven states. Snyder sought records related to the misconduct being investigated by Wilkinson, Beth Wilkinson herself, and witnesses in the investigation.

107.     At least one court believed that Snyder's purpose in pursuing this litigation was to find dirt on people he perceived to be his accusers or enemies. The Court admonished Snyder for

filing petitions that "are improper, unnecessarily invasive, and being done for what the Court perceives is an improper purpose—to discover the sources for the embarrassing and damning *Washington Post* story—rather than the proper purpose of discovering evidence about the defamatory Indian website publications. Even if this were not the intent of the subpoenas, it certainly *has an adverse and chilling effect* when persons who communicate with reporters on a story are at risk of having their phone records searched without substantial justification. I find that justification lacking here" (emphasis added).

108.    In a second case, the Team's former General Counsel, Dave Donovan, filed a lawsuit in federal court to block a witness from participating in the ongoing Wilkinson Investigation. The witness had accused Snyder of sexual assault on his private plane in 2009, resulting in a $1.6 million settlement from the Team. As the Team's signatory, Donovan attempted to enforce the confidentiality provisions in the settlement. Snyder had not released this witness from her non-disclosure agreement so she could participate in the Investigation, despite the Team's assurances to the contrary.

109.    Wilkinson herself suggested that the purpose of Donovan's lawsuit was to interfere with her investigation, and she accused Donovan of using "secret litigation to derail Ms. Wilkinson and her firm, Wilkinson Stekloff LLP, from conducting an independent investigation [] into allegations of sexual and other workplace misconduct."

110.    Wilkinson also described Donovan's efforts as part of a "weeks-long campaign" of attempts to force the witness into "silence and non-cooperation." The Team later endorsed Donovan's tactics by intervening in the litigation to block the release of documents, including the settlement agreement.

111.    Even if Wilkinson was able to resist Snyder's efforts and preserve the integrity and independence of her investigation, Wilkinson's comments make clear that Defendants fought her independence at every step, and they lied to the public when they promised the Team and Snyder's full cooperation.

112.    Later, Snyder used information gathered through these cases to compile a 100-slide dossier on nearly 50 individuals adverse to Snyder, including journalists, victims, whistleblowers, and victims' attorneys, as part of a presentation he made to the NFL and Wilkinson to undermine their credibility.

### c.  Snyder tried to buy witnesses' silence.

113.    The Team and Snyder also attempted to buy the silence of multiple witnesses who had accused Snyder of sexual misconduct, further repudiating their public commitments to safeguard the independence of the Wilkinson Investigation and their public assurance that they were releasing current and former employees from nondisclosure agreements.

114.    Snyder attempted to pay the witness who had alleged that Snyder had assaulted her in 2009 an additional, substantial sum, beyond the amount paid in the original settlement, to prevent her from discussing the incident with Wilkinson.

115.    Snyder also settled claims with many of the cheerleaders who appeared, without their consent, in the voyeuristic calendar shoot videos, and he required them to sign NDAs as a condition of settlement, hindering their ability to speak with Wilkinson.

116.    Separately, Snyder offered financial settlements to another group of former employees who had accused Snyder and Team executives of harassment and misconduct. Snyder offered money to at least one employee in exchange for her silence in the investigation. Another said, "It just felt like they wanted to bury this and shut us up."

3. The League and Team Worked Together to Block the Public's Knowledge of Wilkinson's Findings.

117. When the NFL took over the Wilkinson Investigation, it wanted the public to have confidence in the process and outcome of the investigation. The NFL tried to maintain the appearance of credibility, but it did not follow through on its promises.

118. At the time the NFL took over the Wilkinson Investigation, it already knew that Snyder was sending PIs to witnesses' homes and that Snyder had settled a prior sexual harassment allegation for $1.6 million.

119. The NFL received its first briefing from the Wilkinson team before taking over the Investigation, in late August 2020. Throughout the Investigation, the Wilkinson firm regularly updated the NFL General Counsel's Office about their findings.

120. Despite being read in, the NFL feigned ignorance. In February 2021, during a press conference, Goodell stated that Wilkinson was "nearing the completion" of her work, but that he had not yet met her. He committed that when he received the results of her investigation, he would share them with the Team "and others."

121. By the end of February 2021, the NFL already had extensive, significant information about the Team's toxic culture, the widespread sexual harassment, and Snyder's role in all of it.

122. On March 1, 2021, more than six months after the NFL publicly assumed control of the Wilkinson Investigation, a Washington, D.C. area sports radio program reported that, after reviewing a draft of Wilkinson's written recommendations, her top line recommendation was that the NFL "force the owner to divest his ownership of the team." As an alternative, Wilkinson reportedly recommended that the NFL "suspend the owner for a significant period to allow time to repair its infrastructure and culture."

123.     And yet, with this background, and after the NFL pledged to "take any action based on the findings" at the conclusion of the Wilkinson Investigation, the League demonstrated it had no intention of holding Snyder accountable. Instead, mere weeks after Goodell received his first of two oral briefings from Wilkinson, the NFL chose to make an exception to its rules related to the amount of debt a team owner may carry to allow Snyder to buy out three minority owners, giving him even more power and control around the League.

124.     Thus, rather than waiting for the outcome of the Wilkinson Investigation to ensure Snyder was fit to continue ownership of the Team, the NFL allowed Snyder and his family to consolidate 100% ownership of the team.

125.     When the Investigation did conclude, the Defendants worked together to keep consumers in the dark, under cover of their Agreement.

126.     The Wilkinson Investigation lasted approximately ten months. According to the NFL, the Investigation included interviews with 150 people, including two interviews with Dan Snyder. The Investigation also reviewed hundreds of thousands of Team documents.

127.     In July 2021, the NFL announced the results of the Wilkinson Investigation through a press release. The press release did not provide any details about Wilkinson's findings. Instead, the NFL summarized the Wilkinson's long, thorough investigation by saying only, "for many years the workplace environment at the Washington Football Team, both generally and particularly for women, was highly unprofessional. Bullying and intimidation frequently took place, and many described the culture as one of fear, and numerous female employees reported having experienced sexual harassment and a general lack of respect in the workplace. Ownership and senior management paid little or no attention to these issues."

128.    These few sentences were the entirety of what the League told the public about the investigation's findings. Wrongdoers were not named, and specifics were not provided.

129.    The NFL stated the Team would pay $10 million to unidentified third-party organizations and announced that Snyder was voluntarily stepping away from the day-to-day operation of the Team; his wife, Tanya, had been made co-CEO and would assume management of the Team.

130.    Before the announcement, and operating within the parameters of the Agreement, Snyder and Goodell privately discussed the outcome of the Investigation to reach agreement on the remedial actions that would be taken, including Snyder's own decisions about his role at the Team, and negotiated the content of the press release announcing both.

131.    That same day, the NFL let the public know for the first time that it did "not have a written report" from Wilkinson. Rather, they claimed, the League and Goodell requested to receive Wilkinson's findings "in oral briefings," citing confidentiality concerns.

132.    Many of the witnesses that participated in the Wilkinson Investigation did so because they believed it would contribute to a public airing of the extensive misconduct at the Team, via a public, written report. Those same witnesses have publicly called for the release of a report or findings, and some have said they would not have spoken to Wilkinson had they known there would be no written report.

133.    Counsel for more than 40 former Commanders employees wrote to Commissioner Goodell saying, "You have misrepresented the wishes of our clients, and likely those of other women and men who came forward, to justify your decision to bury what we know would be a damaging report."

134.    To date, the NFL and Goodell have refused to provide the public any additional information about Wilkinson's findings or her recommendations for remedial action.

    4.  <u>Defendants' Actions Contradict Their Public Statements and Undermine Consumers' Confidence in the Investigation's Outcome.</u>

135.    As discussed above, Defendants repeatedly reassured fans that there would be an independent, thorough, and unbiased investigation, free from interference and conducted with the full cooperation of all parties.

136.    Defendants' statements were supported by their encouragement of employees past and present to participate in the Investigation and their implications that they would implement Wilkinson's recommendations.

137.    Taken together, District consumers were left believing that Defendants would do all they could to preserve the integrity of the Wilkinson Investigation, and that its findings would restore their trust and assuage concerns regarding continued support of the franchise.

138.    In reality, the picture Defendants painted for District consumers was terribly misleading, particularly during the Investigation, while consumers continued to purchase tickets and merchandise with the understanding that a thorough, unbiased investigation was underway.

139.    Defendants repeatedly sought to undermine the thoroughness and independence of the Investigation and concealed Wilkinson's findings from the public through a press release shrouded in ambiguity and void of meaningful detail.

140.    Taken together, Defendants' actions revealed a multifaceted attempt to undermine their own promises to the public, leaving District consumers with no greater understanding about what actually happened at the Team than they had before the Wilkinson Investigation began.

IV.     **DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS ARE MATERIAL TO DISTRICT CONSUMERS, WHO CARE DEEPLY ABOUT THE TEAM.**

141.    District consumers, particularly fans and former fans of the Team, care deeply about the allegations of sexual misconduct against Team executives and staff, especially the accusations that Snyder himself sexually harassed and abused employees. Moreover, they care whether the Wilkinson Investigation, aimed at addressing these concerns, was completed in an appropriate, independent, and fair manner. Before it became clear that the details of the Wilkinson Investigation would not be released, Defendants assured District consumers that the Wilkinson Investigation would be unbiased, free from interference, and trusted by fans, with the understanding that District consumers may not purchase tickets for an organization that engaged in such misconduct.

142.    As detailed below, District consumers' reactions when the truth finally came to light demonstrate that the outcome and handling of the Investigation were important factors in their decision to financially support the Team.

143.    For example, one fan penned an op-ed titled "Dear Dan Snyder: I Quit" in which he confessed that he was "canceling [his] fandom," because "[i]t's the depressing off-field spectacle that really rankles—the grim allegations of a toxic workplace and sexual assault and harassment; the NFL investigation that resulted in significant penalties to the team but—infuriatingly—no public report of its findings; and on and on. Who wants to root for all of that?"

144.    In reaction to the misconduct by Snyder, the abusive culture at the Team, and the lack of transparency surrounding the Wilkinson Investigation, fans at the stadium have begun protesting with signs and chants at Team home games demanding Snyder "Sell the Team." Such demands have intensified as new allegations and controversies have surfaced.



145.    Multiple well-trafficked websites have been put up by local fans demonstrating their displeasure with Snyder and the Team:

146.    One site, www.boycottdan.com, urges sponsors to boycott the Commanders and "Drop Dan or We Drop You" as a means of holding Snyder and the Team accountable for the pervasive sexual misconduct.



147.    Another website, www.firedansnyder.org, urges fans to contact their local lawmakers and government leaders to request that they not help the Commanders build a new stadium until Snyder sells the team, and calls for the NFL to release more detailed findings from the Wilkinson Investigation.



148.    The fan reaction to the unsatisfying conclusion of the Investigation demonstrates the importance of Defendants' assertions regarding the Investigation.

## CAUSES OF ACTION

### COUNT I
### DEFENDANTS MADE MISLEADING STATEMENTS AND FAILED TO DISCLOSE MATERIAL INFORMATION RELATED TO THE WILKINSON INVESTIGATION IN VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT
### (ALL DEFENDANTS)

149.    The District incorporates the allegations contained in all prior paragraphs as if fully recited herein.

150.    The CPPA is a remedial statute that is to be broadly construed. It establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

151.    The goods and services that Defendants provide consumers are for personal, household, or family purposes and, therefore, are consumer goods and services.

152.    The Defendants, in their ordinary course of business, supply consumer goods and services and, therefore, are merchants under the CPPA.

153.    District residents receive consumer goods from Defendants through direct sales, advertisements, news outlets, and other commercial means and therefore, are consumers under the CPPA.

154.    The CPPA prohibits unfair and deceptive trade practices in connection with the offer, sale, and supply of consumer goods and services.

155.    Defendants have engaged, and continue to engage in, business acts or practices that have a tendency to mislead consumers. As alleged fully herein, these acts or practices include the following:

      a.  Making explicit and implied misrepresentations related to the Wilkinson Investigation, including but not limited to Defendants' protection of the Investigation's independence, the thoroughness of the investigation, and

cooperation with the investigation, in violation of the CPPA, D.C. Code § 28-3904(e);

b. Failing to disclose material facts, including but not limited to: Defendants' agreement to coordinate with one another in the course of the Wilkinson Investigation, Defendants' interference with the Wilkinson Investigation, and Defendants' refusal to release detailed findings from the Investigation, the omission of all of which tended to mislead consumers and constitute unlawful trade practices that violate the CPPA, D.C. Code § 28-3904(f); and

c. Using ambiguity with respect to material facts related to Defendants' coordination with one another in the course of participating in and responding to the Wilkinson Investigation, the use of which tended to mislead consumers, in violation of the CPPA, D.C. Code § 28-3904(f-1).

**COUNT II**
**SNYDER AND THE TEAM MISLED THE PUBLIC AS TO THEIR KNOWLEDGE OF AND SNYDER'S PARTICIPATION IN CREATING THE TEAM'S TOXIC AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT**
**(WASHINGTON COMMANDERS AND DAN SNYDER)**

156.    The District incorporates the allegations contained in all prior paragraphs as if fully recited herein.

157.    The CPPA is a remedial statute that is to be broadly construed. It establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

158.    The goods and services that the Defendants provide consumers are for personal, household, or family purposes and, therefore, are consumer goods and services.

159.    The Defendants, in their ordinary course of business, supply consumer goods and services and, therefore, are merchants under the CPPA.

160.    District residents receive consumer goods from Defendants through direct sales, advertisements, news outlets, and other commercial means and, therefore, are consumers under the CPPA.

161.    The services that the Team provides consumers through Snyder's ownership, leadership and direct involvement with the day-to-day operations of the Team are for personal, household, or family purposes and, therefore, are consumer goods and services.

162.    The CPPA prohibits unfair and deceptive trade practices in connection with the offer, sale, and supply of consumer goods and services.

163.    The Team and Snyder have engaged, and continue to engage in, business acts or practices that have a tendency to mislead consumers. As alleged fully herein, these acts or practices include the following:

  a.  Misrepresenting to consumers the extent of knowledge and participation of Snyder and Team management in creating the toxic and hostile work environment in violation of the CPPA, D.C. Code § 28-3904(e);

  b.  Failing to disclose material facts regarding Snyder's and Team management's knowledge of and participation in creating the toxic and hostile work environment, the omission of which tended to mislead consumers and constitute unlawful trade practices that violate the CPPA, D.C. Code § 28-3904(f); and

  c.  Using ambiguity with respect to material facts regarding Snyder's and Team management's knowledge of and participation in creating the toxic and hostile work environment, the use of which tended to mislead consumers and constitute unlawful trade practices that violate the CPPA, D.C. Code § 28-3904(f-1).

### PRAYER FOR RELIEF

WHEREFORE, the District requests that this Court enter judgment in its favor and grant relief against Defendants as follows:

(a)    Injunctive relief;

(b)    Equitable and declaratory relief;

(c)    Disgorgement, restitution and damages;

(d)    Civil penalties;

(e)    The District's reasonable attorneys' fees and costs; and

(f)     Such other and further relief as this Court deems appropriate based on the facts and applicable law.

## JURY DEMAND

The District of Columbia demands a jury trial by the maximum number of jurors permitted by law.

Dated:  November 10, 2022             Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

JENNIFER C. JONES
Deputy Attorney General
Public Advocacy Division

/s/ Alicia M. Lendon
ALICIA M. LENDON [1765057]
Chief, Civil Rights Section
Public Advocacy Division

/s/ Adam R. Teitelbaum
ADAM R. TEITELBAUM [1015715]
Director, Office of Consumer Protection
Public Advocacy Division

/s/ Andrew Mendrala
ANDREW MENDRALA [1009841]
TONY TOWNS [433435]
SAMANTHA HALL [1014735]
JESSICA E. FEINBERG [1779644]
NICOLE HILL [888324938]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 727-3400
Andrew.Mendrala@dc.gov
Jessica.Feinberg@dc.gov

*Attorneys for the District of Columbia*

**APPENDIX**

**Defendants' Public Statements.**

Snyder's first statement responding to the allegations reported in the *Post* emphasized his

purported dedication to the thoroughness and independence of the investigation.

## STATEMENT FROM OWNER DAN SNYDER:

The behavior described in yesterday's *Washington Post* article has no place in our franchise or society.

This story has strengthened my commitment to setting a new culture and standard for our team, a process that began with the hiring of Coach Rivera earlier this year.

Beth Wilkinson and her firm are empowered to do a full, unbiased investigation and make any and all requisite recommendations. Upon completion of her work, we will institute new policies and procedures and strengthen our human resources infrastructure to not only avoid these issues in the future but most importantly create a team culture that is respectful and inclusive of all.

11:24 AM · Jul 17, 2020 · Twitter for iPhone

The same day, the NFL issued a statement also to soothe consumer concerns that supporting the Team would mean they were contributing to a misogynistic and toxic environment.



These matters as reported are serious, disturbing and contrary to the NFL's values. Everyone in the NFL has the right to work in an environment free from any and all forms of harassment. Washington has engaged outside counsel to conduct a thorough investigation into these allegations. The club has pledged that it will give its full cooperation to the investigator and we expect the club and all employees to do so. We will meet with the attorneys upon the conclusion of their investigation and take any action based on the findings.

The Team also commented after the second article and encouraged all employees to participate in the investigation and assured the public that all bad conduct will be eradicated.



8:08 PM · Aug 26, 2020 · Twitter Web App

That same day, Snyder issued a second, lengthy statement responding to allegations of his own sexual misconduct against Team employees.

**Statement by Dan Snyder in response to Washington Post Allegations:**

The behavior described in the Washington Post's latest story has no place in our franchise, or in our society. While I was unaware of these allegations until they surfaced in the media, I take full responsibility for the culture of our organization. Even before today's article, I have begun taking any and all steps necessary to ensure that the Washington Football Team is an organization that is diverse, inclusive and respectful of all.

I have admittedly been too hands-off as an owner and allowed others to have day-to-day control to the detriment of our organization. Going forward I am going to be more involved, and we have already made major changes in personnel bringing in new leadership to drive cultural transformation on and off the field. In addition, we are assembling a world class team of external advisors to both investigate these allegations and create an actionable and measurable plan to change our culture.

The Washington Post article reads like a "hit job" relying on un-named sources and allegations that are largely ten to twenty years old. We attempted to engage with the Washington Post to provide them with the facts, but those facts clearly didn't align with their narrative. There are former employees on the record disputing many of these claims, and yet they still appear in print. It is clear that there are other negative agendas at work in this reporting.

We are disappointed that Ms. Scourby would speak to the newspaper but never bring any of these allegations to management's attention, particularly since she is still part of our organization as a volunteer with our cheerleaders. I want to unequivocally state that this never happened. Ms. Scourby did not report this alleged incident to anyone at the team in 2004, in her 8 years as a cheerleader, or at any time in the past 16 years.

Furthermore, I do not have any knowledge of the ten-year old videos referenced in the story. I did not request their creation and I never saw them. There are former employees on the record stating that this did not happen. The unnamed sources who claim it did happen are relying on three degrees of hearsay. After an extensive review of our video archives, we believe these videos to be unauthorized or fraudulent. We requested that the Post provide us with copies of these videos to be forensically evaluated and authenticated, but The Washington Post refused to do so.

This article is riddled with questionable and unnamed sources, decades old allegations and is not a reflection of The Washington Football Team today. I am going to work relentlessly to improve all aspects of the Washington Football Team and make this an organization that sets a positive example that we can all be proud of.

# # #

The NFL and Goodell also issued a public statement in response to the second *Post* article, "strongly condemn[ing]" the allegations against Snyder and again promising the public that "any appropriate action" would be taken as a result of the investigation.



**National Football League**

View this press release online

Aug 26, 2020

**STATEMENT FROM NFL COMMISSIONER ROGER GOODELL**

"We strongly condemn the unprofessional, disturbing and abhorrent behavior and workplace environment alleged in the report which is entirely inconsistent with our standards and has no place in the NFL.

An independent investigation into these issues is in process, led by highly experienced counsel recommended by our office. We will continue to monitor the progress of this investigation and ensure that the club and its employees satisfy their obligation to give full cooperation to the investigators. If at any time the club or anyone associated with the club fails to do so, the investigating counsel has been asked to promptly advise our office and we will take appropriate action. When the investigation concludes, we will review the findings and take any appropriate action at that time."

6:22 PM · Aug 26, 2020 · Twitter for iPhone

Days later, the NFL announced it was taking over the Wilkinson Investigation, and Snyder issued another public statement.

Daniel and Tanya Snyder later released a statement obtained by Rapoport:

*"Recently, The Washington Football Team launched an independent third-party investigation into allegations about our culture and incidents of harassment. In conversations with Commissioner Goodell, Tanya and I suggested that the NFL assume full oversight of the investigation so that the results are thorough, complete and trusted by the fans, the players, our employees and the public. I appreciate Commissioner Goodell agreeing to our suggestion and the entire Washington Football Team remains committed to fully cooperating with all aspects of the investigation."*

In a November 4, 2021 letter to Congress, the NFL explained its rationale for taking over the Wilkinson Investigation.

1. **What reasons did the WFT provide for requesting that the NFL assume "full oversight" over Ms. Wilkinson's investigation, and why did the NFL agree to assume this role?**

   The NFL's understanding is that after the WFT retained Wilkinson Stekloff to conduct an investigation of the club's workplace culture, the WFT felt the NFL should assume responsibility over Ms. Wilkinson's investigation to eliminate questions or concerns about the independence of that investigation. Because the League believed assuming oversight of the investigation would facilitate a credible, thorough, and independent investigation, and would provide greater public assurance of the integrity and independence of the investigation, the League concluded that it should assume oversight over Ms. Wilkinson's investigation. The League also believed it was important to reassure potential victims that their experiences would be taken seriously by the investigators and would be kept confidential.

After approximately ten months of investigation, on July 1, 2021, the NFL and Goodell announced the "outcome of [the] Washington Football Team workplace review." The entire statement is incorporated here by reference.



**NFL ANNOUNCES OUTCOME OF WASHINGTON FOOTBALL TEAM WORKPLACE REVIEW**

The National Football League today announced the outcome of the workplace review of the Washington Football Team led by independent counsel Beth Wilkinson, as well as remedial measures and penalties arising out of that review.

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
## INFORMATION SHEET

District of Columbia
Case Number: 2022-CAB-005171

vs
Date: November 10, 2022

Pro-Football, Inc. d/b/a Washington Commanders, et al.
☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* Jessica E. Feinberg | Relationship to Lawsuit |
| Firm Name: Office of the Attorney General for the District of Columbia | ☒ Attorney for Plaintiff |
| Telephone No.: 202-735-6637    Six digit Unified Bar No.: 1779644 | ☐ Self (Pro Se)  ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury    ☐ 6 Person Jury    ☒ 12 Person Jury

Demand: $ Unspecified    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____    Judge: _____    Calendar #:_____

Case No.:_____    Judge: _____    Calendar#:_____

---

**NATURE OF SUIT:**    *(Check One Box Only)*

**A. CONTRACTS**                  **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent  ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent  ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation              ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                 Over $25,000 Pltf. Grants Consent        Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation              ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees             Under $25,000 Pltf. Grants Consent       Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                       Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile          ☐ 03 Destruction of Private Property  ☐ 05 Trespass
☐ 02 Conversion          ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process          ☐ 10 Invasion of Privacy            ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection   ☐ 11 Libel and Slander                   Not Malpractice)
☐ 03 Assault and Battery       ☐ 12 Malicious Interference         ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution       ☐ 19 Wrongful Eviction
☒ 05 Deceit (Misrepresentation) ☐ 14 Malpractice Legal            ☐ 20 Friendly Suit
☐ 06 False Accusation          ☐ 15 Malpractice Medical (Including Wrongful Death) ☐ 21 Asbestos
☐ 07 False Arrest              ☐ 16 Negligence- (Not Automobile,  ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                           Not Malpractice)             ☐ 23 Tobacco
                                                                  ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  - (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  - (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  - Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  - Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  - Judgment [ D.C. Code §
  - 2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  - 42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  - [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  - (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

*Jessica Feinberg*
_____
Attorney's Signature

11/10/22
_____
Date

CV-496/ June 2015